

NUMBER 13-06-00564-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JUAN JOSE SANCHEZ,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

**On appeal from the 63rd District Court
of Val Verde County, Texas.**

# MEMORANDUM OPINION ON REHEARING

**Before Chief Justice Valdez and Justices Yañez and Garza
Memorandum Opinion on Rehearing by Justice Yañez**

On November 18, 2010, appellant, Juan Jose Sanchez, filed a motion for rehearing, requesting that the Court reconsider its disposition of his appeal. We grant the motion for rehearing, withdraw our previous opinion and judgment of October 21, 2010, and substitute the following in its place.

Sanchez was convicted of sexual assault of a child, a second-degree felony and

was sentenced to five years' confinement.[1]  Sanchez challenges the judgment by three issues.  In his first two issues, Sanchez contends that:  (1) the trial court's comment that "police officers are the number one enforcers of [the] constitution" during voir dire constituted fundamental error; and (2) "the credibility of the verdict was fundamentally undermined" by a juror who had pleaded guilty to a felony crime of moral turpitude.  In the alternative, Sanchez requests, by his third issue, that this Court "recognize that the concurrence in *White v. State* correctly analyzed the law and find that [the juror's] presence during deliberations constituted an 'outside influence.'"[2]  We affirm.[3]

## I. BACKGROUND

T.G. testified that she lived with her mother, her mother's boyfriend, and her uncle, Sanchez.  T.G. stated that, on April 18, 2004, after returning from a short trip to San Antonio, Texas, she went to Sanchez's bedroom to talk to him.[4]  T.G. testified that she told Sanchez that while she was in a hotel's swimming pool, a boy, approximately her age, put his finger in her vagina.[5]  T.G. stated that while she talked to Sanchez, she was lying on her stomach on the floor playing with her cat and Sanchez was putting clothes away in his closet.  T.G. testified that Sanchez then "sat down on her legs" and started rubbing her back.  According to T.G., Sanchez then turned her around onto her back, pulled her jeans

---

[1] *See* TEX. PENAL CODE ANN. § 22.011(a)(2)(A) (Vernon Supp. 2010).

[2] *See White v. State*, 225 S.W.3d 571, 574 (Tex. Crim. App. 2007).

[3] This appeal was transferred to this Court from the Fourth Court of Appeals pursuant to a docket-equalization order issued by the Texas Supreme Court.  *See* TEX. GOV'T CODE ANN. § 73.001 (Vernon 2005).

[4] T.G. was born on February 15, 1990; therefore, she was fourteen years old on the date of the incident.

[5] On re-direct examination, regarding the incident with the boy in the swimming pool, the State asked, "Did you [T.G.] consider that being molested," and T.G. responded, "No."

2

and underwear down to her knees, put his finger in her vagina, and moved it "back and forth." T.G. testified that Sanchez eventually asked her if she wanted him to stop, and she said, "Yes." T.G. explained that after Sanchez stopped, she pulled her underwear and jeans back on and wanted to leave; however, Sanchez asked T.G. to sit with him and talk for a little while. T.G. testified that Sanchez told her that he was sorry and he would never do it again. According to T.G., she then went to the kitchen and grabbed a knife because she "didn't want to live anymore." T.G. stated that she dropped the knife, dropped down to her knees, and started crying; she then told her mother what Sanchez had done, and her mother called the police.

Robert Hernandez, a sergeant with the Del Rio Police Department's patrol division, testified that he tape-recorded an interview with Sanchez. Sergeant Hernandez stated that he advised Sanchez of his constitutional rights and that Sanchez signed a "waiver of rights." Sergeant Hernandez informed Sanchez of T.G.'s allegations and asked Sanchez for his version of the incident. According to Sergeant Hernandez, Sanchez stated that he had "gone too far" and that Sanchez was "moving his left index finger down like this, like that, he had placed his hand on her crotch as he said and did this and told her to stop." Sergeant Hernandez stated:

> That the way Mr. Sanchez explained [the incident] was that [the] young lady had lowered her pants and underwear down herself below her crotch. . . . He stated it was an accident. . . . He says that the young lady grabbed his hand while he was on her crotch, took both of his hands. . . . He stated that they had—it had gone too far, we shouldn't have done this, it shouldn't have gone this far.

The trial court then admitted State's exhibit two—three audio tapes of Sergeant

3

Hernandez's interview with Sanchez—into evidence without objection.[6]

On cross-examination, Sanchez's counsel asked Sergeant Hernandez, "And if the force of her hand caused him to penetrate, okay, that wouldn't be a criminal offense, would it," Sergeant Hernandez replied, "If what you say is true, yes, sir." Sanchez's counsel then asked, "Okay, and if he didn't do it on purpose, but the force from her—the child putting her hand on his caused any penetration whatsoever, you understand that is not his own intentional act, correct," Sergeant Hernandez responded, "I wouldn't be able to describe what those intentional acts were."

On the audio recording, Sanchez admitted that "just the tip" of his index finger on his left hand went inside T.G.'s vagina. During the interview, Sanchez appears to claim that his finger somehow accidentally slipped into her vagina. He stated that T.G. was explaining what had happened with the boy at the swimming pool and that she pulled her pants down and "showed [Sanchez] what [the boy] did." According to Sanchez, he asked T.G. to pull her pants back up and told her "we can't." Sanchez speculated that T.G. was attempting to "lure" him into a sexual encounter. Sanchez claimed that he touched T.G.'s vagina when he attempted to pull up her pants.

T.G.'s mother, C.S.L., testified that she was lying in bed when T.G. came into the room waving at C.S.L. and nudging her. C.S.L. asked T.G. to tell her what was wrong, and T.G. was unable to talk and continued waving at C.S.L. C.S.L. stated that she then got up, followed T.G. to the hallway, and T.G. still could not talk. C.S.L. described T.G. as having her eyes wide open, "in shock," and "sort of" jumping up and down. C.S.L. testified that she continued asking T.G. what was wrong, and thinking that T.G. was choking, "hit" her

---

[6] It appears from the record that only portions of the tapes were played in open court when Sergeant Hernandez identified each voice heard on the tapes.

4

back.  After approximately thirty minutes, T.G. "blurted out something."  However, C.S.L.

stated that she could not understand what T.G. said.  Eventually, C.S.L. understood what

T.G. was saying, and C.S.L. called the police.[7]  According to C.S.L., approximately a week

later, while she was at her mother's house, Sanchez arrived, began crying, and told the

family, "yes, I did it . . . ."  C.S.L. stated that she could not understand anything else

Sanchez said.

Sanchez was indicted for the offense of sexual assault of a child and the case went

to trial.[8]  During voir dire, defense counsel asked the jury panel the following:

> Okay.  How many people feel the exact same way that [venire member forty-
> two] does, that because you give greater weight to the testimony of a peace
> officer, you would require a defendant in any case, not just this case, any
> case to produce evidence in order to demonstrate his guilt—his innocence,
> excuse me. . . .  Okay.  Now, even though you feel that way can you put
> aside those feelings, because in fact your feelings are in direct contradiction
> to what the law requires, okay?  The law doesn't require any defendant in
> any criminal case to produce one piece of evidence for one simple reason.
> He's presumed innocent, and that presumption of innocence is so great that
> if you had a hundred police officers testifying and you didn't believe their
> testimony beyond a reasonable doubt, even though he sat in silence and
> remained mute, you would be duty bound to acquit, okay?  Again, that's the
> law, and that may not be how you feel, but the question is, can you set aside
> your feelings and follow the law, so let's start with [venire member twelve].
> Can you set aside your feelings and follow the law, or do you think that a
> defendant has got to produce evidence in order to overcome what a peace
> officer testifies to?

Venire member twelve replied, "I'm a law enforcement officer, so I tend to give it a little

more credit, you know, to the law enforcement officer.  It would be hard to . . . ."  At this

point, the trial court interrupted venire member twelve and stated:

> Excuse me, excuse me.  Before we do this[,] listen very carefully to what
> [defense counsel] is talking about here.  I know we have a number of law

---

[7] C.S.L. did not state what T.G. said to her about the incident.

[8] *See* TEX. PENAL CODE ANN. § 22.011(a)(2)(A).

enforcement officers on the panel today, and I know you take this personally. I take the United States Constitution and the laws that form this country personally, too, and I believe that police officers are our number one enforcers of that constitution, so listen carefully to what [defense counsel] is asking you. Go ahead.

Defense counsel did not object to the trial court's comment and stated:

Let me see if I can give it to you differently. I'm not here to trap police officers or teachers or anyone else, and quite frankly, having been a prosecutor, I know exactly how you feel, but even though you feel that way, that may not be what the law requires in order for you to sit on the jury. That attitude could be perfectly reasonable when you are out in the field making a bust or an arrest, okay? If I were an officer making arrests, I would trust my partner more than I would a civilian who told me something. That's normal, but out here you are in a different situation. My question is, can you put aside the way that you have been trained to think and the way you normally think and say look, I'm going to follow the law; I'm going to follow the constitution, and I'm going to do what I swear to do if I'm selected as a juror. That's my question. Can you judge a civilian the same way on just a standard easy fact situation as you would—would you give his testimony the same weight that you would a peace officer as to what color the wall is, or would you naturally believe the police officer if he said it was beige as opposed to yellow? That's all I'm asking. Do you think you can do that or not, [venire member twelve], and I'm not criticizing you.

After Sanchez's trial counsel completed his questioning of the jury panel, the trial court

stated the following:

When an attorney asks a question that could result in a challenge for cause I have to make absolutely sure you understand what he's asking. There is a major difference between whether we have the highest hope that police officers will always tell the truth. I think every person in this room has that feeling. That's one thing. It is quite another thing when an attorney is asking you when that police officer walks through that door, does he walk through invested with absolute truth like no other person, whether it is a preacher, president of the United States or anybody else. When they walk through the door of this courtroom they are like anybody else. You get on that witness stand, you testify and that jury determines whether you are telling the truth or you are fibbing. Nobody is couched with absolute—that privilege, and that is what the attorneys are asking you. Just because they are police officers would you automatically believe them, that they are telling the truth and nobody else, and does that automatically shift the burden of proof in a criminal case to the defendant's side of the case, which violates the United States Constitution. The United States Constitution says a person that is

6

accused of a crime carries no burden of proof.  Only the District Attorney carries the burden of proof, and that's the reason I asked that, so [venire member twelve], I wasn't jumping on you, I just wanted to make sure that was clear.

The jury was empaneled, and after a trial on the merits, Sanchez was convicted of sexual assault of a child.[9]  This appeal ensued.

## II.  PRESERVATION OF ERROR

By his first issue, Sanchez contends that the trial court's statement that he "believe[d] that police officers are our number one enforcers of [the] constitution" was fundamental error.  Specifically, Sanchez argues that:  (1) "[t]he trial judge's stated bias in favor of law enforcement destroyed [his] presumption of innocence"; (2) the comment "stripped [him] of his right to an impartial judge"; and (3) the comment "eviscerated [his] right to an impartial tribunal."  Finally, Sanchez claims that he suffered "great harm as a result of the trial court's comments."

As a general rule, a party must object to a trial court's comments in order to preserve error for appellate review.[10]  Sanchez concedes that he did not object to the trial court's comment that he complains of on appeal.  However, relying on *Blue v. State*, Sanchez argues that the trial court's comment amounted to fundamental error; therefore, he was not required to object to preserve error.[11]

In *Blue*, after apologizing to potential jurors for a delay in the proceedings, the trial court blamed the defendant for the delay stating:

Frankly, an offer has been made by the State or do I go to trial.  And he [the

---

[9] *See* TEX. PENAL CODE ANN. § 22.011(a)(2)(A).

[10] *Blue v. State*, 41 S.W.3d 129, 131 (Tex. Crim. App. 2000) (en banc) (plurality op.).

[11] *Id.* at 132-33.

7

defendant] has been back and forth so I finally told him [the defendant] I had enough of that, we are going to trial. You have been sitting out here and this is holding up my docket and I can't get anything done until we know if we are going to trial or not.[12]

The trial court then told the potential jurors that he preferred for the defendant to plead guilty because it would save time and resources.[13] The Texas Court of Criminal Appeals concluded that the trial court's comments amounted to fundamental error because "the judge's comments imparted information to the venire that tainted the presumption of innocence."[14] The court reasoned that:

A juror who knows at the outset that the defendant seriously considered entering into a plea agreement no longer begins with a presumption that the defendant is innocent. A juror who hears the judge say that he would have preferred that the defendant plead guilty might assume that the judge knows something about the guilt of the defendant that the juror does not. Surely, no trial judge would want an innocent man to plead guilty, no matter how much delay and expense he might be causing.[15]

We find that *Blue* is distinguishable from the facts in this case. The record in this case shows that the venire included several police officers, former police officers, or people who worked closely with law enforcement. During the voir dire, defense counsel asked generally if the members of the venire "give greater weight to what [a police officer] had to say." Venire member twenty stated that "[i]n [his] line of work you learn to trust people with a badge" and that he would "put more validity on what they [people with a badge] say than somebody else. . . ." Several other venire members then stated that they agreed with that sentiment—one stating that "all those people you named [witnesses for the State] are my

---

[12] *Id.* at 130.

[13] *Id.*

[14] *Id.* at 132.

[15] *Id.*

8

supervisors."  Venire member forty-two stated that although he did not work with law enforcement, he was a "hearing officer with the school district," he "tended to lean towards the policeman reviews or their summaries more,"  and he "tend[ed] to take their [police officers'] word on [sic] more weight. . . ."  When defense counsel asked if venire member forty-two would require the defendant to "produce evidence to disprove whatever a peace officer or police officer said," venire member forty-two replied, "Yes."  Eight venire members agreed with venire member forty-two's statements.  Defense counsel then asked if those members could "set aside [their] feelings and follow the law."  Venire member twelve stated that he was a law enforcement officer, and he "tend[ed] to give [police officers] a little more credit."

The trial court then interrupted the voir dire asking the venire to listen carefully to the defense counsel's questions and acknowledging that the venire included members of law enforcement.  When the complained-of comment was made, it appears that the trial court was attempting to clear up some confusion amongst the venire concerning questions regarding the truthfulness of law enforcement personnel.[16]  Although the trial court's comment may have been inartful, it appears that the trial court was attempting to convey to the law enforcement officers present on the venire that it believed that police officers play an important role in the administration of justice.  Defense counsel immediately stated that he was not there "to trap police officers" and clarified that he was attempting to determine whether the venire members "would naturally believe the police officer if he said [the wall] was beige as opposed to yellow" and that he was not "criticizing" venire member

---

[16] *See Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001) (providing that the trial court's comments were merely "aimed at clearing up a point of confusion" and did not rise "to such a level as to bear on the presumption of innocence or vitiate the impartiality of the jury").

twelve.

The trial court later explained that it has a duty to ensure that the venire members understand the questions asked during voir dire and that there is a "major difference" between a hope that police officers would always tell the truth and a belief that a police officer is automatically telling the truth. The trial court also made it abundantly clear that it was attempting to ensure that venire members understood that the mere fact that a person is a police officer does not mean that he or she is telling the truth and that the United States Constitution places the burden of proof on the State and that the accused has no burden of proof.

In *Blue*, the trial court's statement that it preferred for the defendant to plead guilty implied that it knew that the defendant was guilty because, as the court of criminal appeals explained, no trial court would want someone to plead guilty to a crime he or she did not commit to save time and money. Here, the trial court did not imply that Sanchez was guilty or state his opinion regarding Sanchez's guilt; and taking the complained-of comment in context, the trial court was attempting, perhaps unsuccessfully, to clear up some confusion.[17] Therefore, the trial court's comment in this case did not rise to level of the comments made by the trial court in *Blue*.[18] We conclude that the trial court's comment in this case was not so serious as to taint the presumption of innocence; and thus did not constitute fundamental error. Accordingly, because Sanchez did not object to the trial

---

[17] *See id.*

[18] *See id.* at 420-21; *see also Brumit v. State*, 206 S.W.3d 639, 644-45 (Tex. Crim. App. 2006) (holding that the trial court's comment that a previous case made the trial court "think that anybody that ever harmed a child should be put to death" did "not reflect bias, partiality, or that the trial judge did not consider the full range of punishment").

10

court's comment, he did not preserve this alleged error.[19] We overrule Sanchez's first issue.

## III. JUROR DISQUALIFICATION

By his second and third issues, Sanchez challenges the trial court's denial of his motion for new trial because Norma Rios, a member of the jury that convicted Sanchez, was absolutely disqualified from serving on the jury. Sanchez argues that "[t]he mere presence of a person who is absolutely disqualified from service may be sufficient evidence of 'significant harm.'" The State concedes that Rios was absolutely disqualified to serve as a juror. The record reveals and the State concedes that Norma Rios pleaded guilty to the offense of tampering with physical evidence and was on deferred adjudication community supervision when she served on the jury that convicted Sanchez.[20]

### A. Pertinent Facts

After we remanded this case to the trial court, a hearing on Sanchez's motion for new trial was held. At the hearing, Sanchez presented the testimony of, among others, the Honorable Thomas F. Lee, Jack Stern, and Rios.

Judge Lee, the judge who presided over Sanchez's trial, testified that when he "qualified the jury," he asked about felony convictions and pending felony charges. According to Judge Lee, unless a juror informs him of the pending charges or convictions, he must assume that the jurors are qualified.

Stern, Sanchez's trial counsel, testified that Judge Lee told him that "there may have

---

[19] *See Blue*, 41 S.W.3d at 132 (concluding that no objection is required if the error is fundamental).

[20] *See* TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(3) (Vernon 2006) (providing that a person may not be impaneled if that person "is under indictment or other legal accusation for misdemeanor theft or a felony"); TEX. PENAL CODE ANN. § 37.09(c) (Vernon Supp. 2010) (stating that the offense of tampering with physical evidence is a third degree felony).

11

been an unqualified juror on the panel"; on cross-examination, Stern clarified that he was notified of the possible disqualified juror after the jury returned the verdict.[21] On re-direct examination, Stern testified that the motion for new trial he filed with the trial court stated, "on the date following sentencing[,] prosecutors and the sitting judge advised defense counsel that one of the jurors failed to disclose she was on felony deferred adjudication probation."

Rios testified that she completed a jury questionnaire prior to serving as a juror in this case. Rios stated that on the questionnaire, she answered "No" to the question, "[H]ave you ever been an accused, complainant or witness on a criminal case[?]" However, at the motion for new trial hearing, Rios admitted that she had been accused of the felony offense of tampering with evidence, that she received two years of deferred adjudication community supervision after pleading guilty to that offense, and that she was still on community supervision when she served as a juror in this case.

The trial court denied Sanchez's motion for new trial. In its findings of fact and conclusions of law, the trial court concluded that Rios was disqualified to serve as a juror but that Sanchez failed to show that he suffered significant harm due to Rios's service. The trial court also concluded that Sanchez "failed to elicit any evidence that juror Rios brought any outside influence improperly to bear against any juror during the jury's deliberations."

## B. Standard of Review and Applicable Law

We review the trial court's denial of a motion for new trial under an abuse of

---

[21] The record does not reveal whether Judge Lee was told that Rios was not qualified after the verdict.

12

discretion standard of review.[22]

> We do not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable. We must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party. Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling.[23]

In a criminal case, a conviction

> may be reversed on the ground that a juror . . . was absolutely disqualified from service . . . only if: (1) the defendant raises the disqualification before the verdict is entered; or (2) the disqualification was not discovered or brought to the attention of the trial court until after the verdict was entered and the defendant makes a showing of significant harm by the service of the disqualified juror.[24]

## C. Discussion

Here, Sanchez discovered that Rios was disqualified after the verdict was entered; therefore, he had the burden of showing that he suffered significant harm by Rios's service on the jury.[25] The trial court concluded that Sanchez had not shown significant harm. Therefore, we must sustain Sanchez's issue only if no reasonable view of the record could support the trial court's ruling.[26]

By his second issue, Sanchez argues that Rios's mere presence during jury deliberations constituted significant harm. In *White v. State*, the appellant argued that the

---

[22] *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004).

[23] *Id.*

[24] TEX. CODE CRIM. PROC. ANN. art. 44.46 (Vernon 2006).

[25] *See id.*; *White v. State*, 225 S.W.3d 571, 574 (Tex. Crim. App. 2007) (explaining that when a defendant discovers that a juror was not qualified to serve after the entry of verdict, "[a] duty on the defendant arises in an appeal to make a showing of significant harm") (internal quotations omitted).

[26] *See Charles*, 146 S.W.3d at 208.

13

mere presence of two jurors who were not qualified to serve because each had pending criminal charges against them caused him significant harm.[27] The court of criminal appeals stated that it was "unconvinced by [the] appellant's contention that the [disqualified] jurors' mere presence was 'significant harm'" and that "[t]he plain language of the Rule 606(b) indicates that an outside influence is something outside of both the jury room and the juror."[28] We agree with the court of criminal appeals, and we are not persuaded that Sanchez showed significant harm merely by proving that Rios was disqualified from serving on the jury.[29] At the motion for new trial hearing, although Sanchez proved that Rios was absolutely disqualified, he presented no evidence that he suffered significant harm directly attributable to Rios's service on the jury.[30]

By his third issue, Sanchez argues that Rios's presence constituted an outside influence on the jury; "thus constituting *per se* 'significant harm' by violating [his] rights to have his case decided by twelve jurors, to due process, and to due course of law." Sanchez has cited no authority establishing that evidence of an outside influence on the

---

[27] *White*, 225 S.W.3d at 573-74.

[28] *Id.* at 574. Rule 606(b) states, in pertinent part,

a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. . . . However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror . . . .

TEX. R. EVID. 606(b).

[29] *See White*, 225 S.W.3d at 574.

[30] *See White v. State*, 181 S.W.3d 514, 517 (Tex. App–Texarkana 2005), *aff'd*, 225 S.W.3d 571 ("[T]he record from the post-trial hearing must demonstrate the defendant's alleged substantial harm is directly attributable to the service of the objectionable jurors."); *Ristoff v. State*, 985 S.W.2d 623, 624 (Tex. App.–Houston [1st Dist.] 1999, no pet.) (concluding that although the "[a]ppellant filed a motion for new trial asserting the juror was absolutely disqualified from jury service by virtue of her indictment[,]" the appellant failed to meet his burden because "at the hearing on appellant's motions, [the] appellant made no attempt to show significant harm" and none was apparent from the record).

jury constitutes significant harm. However, assuming without deciding that evidence of an outside influence on the jury constitutes significant harm, we are not persuaded by Sanchez's argument.[31] The court of criminal appeals in *White* rejected the same argument Sanchez makes in this appeal—that the presence of two absolutely disqualified jurors participating in the deliberations was by itself an outside influence. Again, the court concluded that an outside influence "is something outside of both the jury room and the juror."[32] Therefore, we cannot conclude that Rios's presence constituted an outside influence.[33] Sanchez urges us to disregard the majority's opinion in *White* because "no defendant will be able to meet the standard as set forth in article 44.46(2)" if we conclude Rios's presence did not cause him significant harm.[34] We decline to do so; the holding in *White* is binding precedent.[35]

---

[31] "A new trial must be granted if, 'after retiring to deliberate, the jury has received other evidence.'" *Garza v. State*, 82 S.W.3d 791, 794 (Tex. App.–Corpus Christi 2002, no pet.) (citing TEX. R. APP. P. 21.3(f)).

[32] *White*, 225 S.W.3d at 574. Rule 606(b) states, in pertinent part, that:

> a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. . . . However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror . . . .

TEX. R. EVID. 606(b).

[33] *See White*, 225 S.W.3d at 574; *Garza*, 82 S.W.3d at 794 ("The outside influence must come from outside the jury and its deliberations.").

[34] Sanchez requests that we follow the reasoning in Judge Tom Price's concurring opinion. *See White*, 225 S.W.3d at 575 (Price, J., concurring opinion) (stating that "absolutely disqualified jurors do not really constitute 'jurors' at all, such that their input would amount to 'communications and contacts with third parties[,]' the quintessential example of an 'outside influence'").

[35] *See Sierra v. State*, 157 S.W.3d 52, 60 (Tex. App.–Fort Worth 2004), *aff'd*, 218 S.W.3d 85 (Tex. Crim. App. 2007) (noting that an intermediate appellate court "is bound by the precedent of the Texas Court of Criminal Appeals and has no authority to disregard or overrule" it); *see also Swilley v. McCain*, 374 S.W.2d 871, 875 (Tex. 1964) (stating that, "[a]fter a principle, rule or proposition of law has been squarely decided by the Supreme Court, or the highest court of the State having jurisdiction of the particular case, the decision is accepted as a binding precedent by the same court or other courts of lower rank when the very point is again presented in a subsequent suit between different parties").

Therefore, viewing the evidence in the light most favorable to the trial court's ruling, we conclude that the trial court did not abuse its discretion in denying Sanchez's motion for new trial.[36]  We overrule Sanchez's second and third issues.

## IV.  CONCLUSION

We affirm the trial court's judgment.

LINDA REYNA YAÑEZ,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).
Delivered and filed the
16th day of December 2010.

---

[36] *See Charles*, 146 S.W.3d at 208.